STANLEY H. BRAMS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Brams v. Commissioner
Docket No. 11051-80.
United States Tax Court
T.C. Memo 1983-25; 1983 Tax Ct. Memo LEXIS 754; 45 T.C.M. (CCH) 517; T.C.M. (RIA) 83025; January 17, 1983. Irving F. Keene, for the petitioner. Richard A. Witkowski, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioner's Federal income tax as follows: Year
Deficiency
1973
$9,474.29
1974
8,264.82
1975
7,150.91
1976
8,338.15
By amended answer respondent requested the Court to determine an additional deficiency for 1973 of $67,384.18 making the total deficiency for that year $76,858.47. The issue for decision is whether an amount received by petitioner is taxable as ordinary income under sections 301, 302, 304, and 316 or whether it is taxable as capital gain under section 351(b). [1]
FINDINGS OF FACT The case was submitted fully stipulated. *762 The stipulation of facts, the supplemental stipulation of facts, and the attached exhibits are incorporated herein by this reference. Petitioner resided in Farmington, Michigan, when he filed his petition in this case. The transaction, whose tax consequences are in issue here, involved three Michigan corporations, Labor Trends, Inc. (L), Trends Publishing Company (P), and Brams Communication Services Company (C). C corporation was established in 1962. It was engaged primarily in the business of transmitting public relations releases, news releases, and other information to newspapers, and radio and television stations. P corporation was established in 1963. Its business was the publication of books and pamphlets that were primarily concerned with labor relations. L corporation was established in 1964. It published a monthly newsletter that was concerned with labor relations and labor contracts. The three corporations occupied the same office space, shared many of the same employees, and used the same telephones and office equipment. The three corporations had identical profit-sharing plans. The profit-sharing plans recognized employment time for each corporation as *763 time credited to vesting under all plans. On December 1, 1973, petitioner owned 100 percent of the stock of L corporation and 100 percent of the stock of P corporation. The stock of C was owned as follows: Relationship to
Number of
Shareholder
Petitioner
Shares
Stanley H. Brams
Petitioner
30
John B. Brams
Son
25
James O. Brams
Son
25
Irving F. Keene
Attorney
1
The Stanley H. Brams
Trust
14
Treasury Stock
5
The income beneficiaries of the Stanley H. Brams Trust were petitioner's sons, John B. Brams and James O. Brams. On December 1, 1973, C declared a stock dividend of 200 shares of C stock for each share owned by the shareholders on that date. Also on December 1, 1973, a joint meeting of the shareholders and directors of the three corporations was held. At this meeting the value of the L stock was established at $115,000 plus receivables and accounts. [2] Also at this meeting the value of P corporation was established at $21,000. The value of each share of C corporation stock was established at $30 a share.
*764 The report of the meeting further stated that the original purpose of organizing as three corporations had been to limit the risk of loss to all corporations by dividing the businesses, which were subject to different risks. Since C had recently expanded the scope of its business, the directors thought there was no longer a business reason to continue the three corporations as three separate entities and decided that the business of the corporations would be advanced and the costs reduced if the three corporations were combined. In order to accomplish the combination of businesses, it was decided that C would acquire all of the stock of P in exchange for 700 shares of C stock in what purported to be a reorganization under section 368(a)(1)(B) and P would then continue to operate as a wholly-owned subsidiary of C. It was also decided that C would purchase all of the stock of L from petitioner for $115,000 plus receivables and accounts and would also be operated as a subsidiary of C. The following motions were made on behalf of the three corporations and were unanimously passed: MOVED that the value of the stock of Brams Communications Service, Inc., which is issued and outstanding, *765 be established at $30.00 per share, and that the value of Trends Publishing Company be established at $21,000 and that the value of Labor Trends be established at $115,000; and MOVED that Brams Communications Services, Inc., exchange 700 shares of Treasury Stock for all of the outstanding stock of Trends Publishing Company; and MOVED that Brams Communications Services, Inc., purchase the stock of Labor Trends for the sum of $115,000 plus receivables and accounts, the purchase to be made upon the following terms: The sum equal to 20% of the purchase price shall be paid on December 1, 1973, in cash or other assets of the purchasing corporation having a readily determinable market value. If securities are used, the valuation date shall be November 30, the nearest trade date. An additional 20% of the purchase price shall be payable on or before January 10, 1974, but not prior to December 31, 1973. The payment shall be made in cash or securities and, if the latter, the valuation shall be made at the highest trade on the date of payment. The balance of the purchase price shall be paid on the 10th day of January of each year in installments of not less than 20% of the original purchase *766 price with the final installment to be paid in 1976. Interest at the rate of 6% per annum shall be paid in addition to principal payments. The corporation shall issue its Installment Promissory Note for the obligation and agrees to establish a specific reserve for payment of the debt which shall be subject to a security interest in favor of the seller. The use of the reserve for operating capital shall be permitted with the approval of the seller, but all proceeds of the reserve shall be immediately returned to the reserve to the full extent of the principal balance then remaining. Pursuant to the above resolutions, C executed an Installment Promissory Note payable to the order of petitioner in the amount of $97,581.69, plus interest at six percent. The note provided for principal payment of $24,395.42 on January 10, 1974, and an equal amount on January 10, 1975, January 10, 1976, and January 10, 1977. The note was dated December 1, 1973. Also on that date a memorandum of sale was prepared, which recited a total purchase price of $121,977.11 for all of petitioner's L stock. This memorandum stated that the first installment in the amount of $24,395.42 [3] was paid on December 1, 1973. *767 The memorandum stated: Pursuant to the action of the Boards of Directors, BRAMS COMMUNICATIONS SERVICES COMPANY purchases and STANLEY H. BRAMS sells all of his shares in Labor Trends, Inc., a Michigan corporation. The purchase price has been determined as follows: Agreed purchase price for the publication,
its trade name, good will,
mailing lists, subscriptions and
office equipment
$115,000.00
Accounts
6,977.11
TOTAL PURCHASE PRICE
$121,977.11
First installment at 20% of
purchase price
$ 24,395.42
The first installment has been paid by transfer of the following assets: 1.
Cash
$7,752.92
2.
November 30, 1973 value.
Method of valuation: Market quote,
New York Stock Exchange.
3.
100 shares Northwest Airlines
2,062.50
4.
100 shares Delta Airlines
3,737.50
5.
100 shares Allegheny Airlines
575.00
6.
100 shares Eastern Airlines
650.00
7.
500 shares Generics Corporation
1,500.00
8.
100 shares Guardian Industries
1,412.50
9.
100 shares Continental Telephone
1,850.00
10.
100 shares Imperial Corporation
875.00
11.
100 shares Rockwell International
2,562.50
12.
210 shares Sky City Stores
1,417.50
*768 Also pursuant to the December 1, 1973 resolutions, petitioner received from C corporation 700 shares of C stock in exchange for all of his P stock. After the stock dividend, the exchange of C stock for P stock, and the sale of L stock to C corporation, the ownership of C corporation was as follows: Relationship to
Number of
Shareholder
Petitioner
Shares
Stanley H. Brams
Petitioner
6,730
John B. Brams
Son
5,025
James O. Brams
Son
5,025
Irving F. Keene
Attorney
201
The Stanley H. Brams
Trust
2,814
Treasury stock
1,005
The purchase price of the L stock of $121,977.1 was paid in three installments of $24,396.32 in each of the years 1973, 1974, and 1975, and two payments of $24,395.42 in each of the years 1976 and 1977. At the time of C's purchase of the L stock, C had earnings and profits in excess of $121,977.11, the total purchase price of the L stock. In each of the years 1973 through 1976, C had earnings and profits in excess of the amount of each installment. Petitioner reported no gain or loss on the exchange of his P stock for C stock and reported long-term capital gain on the sale of his L stock to C. The sale was reported as *769 an installment sale on petitioner's Federal income tax returns for 1973, 1974, 1975, and 1976. Respondent issued his notice of deficiency on June 3, 1980. Respondent determined that the purported sale of L stock to C was a distribution in redemption of the stock of C and was taxable to petitioner as ordinary income under sections 301, 302, 304, 316, and 317. OPINION Petitioner owned 100 percent of the stock of L and P and some of the stock of C. It was decided that there was no longer any business reason to continue operating as three separate corporations, and it was decided to combine these operations. There was an exchange between C corporation and petitioner of 700 shares of C stock for all of petitioner's P stock. Since petitioner was a 100 percent shareholder of P, C corporation then owned 100 percent of the P stock and continued to operate P as its wholly-owned subsidiary. This exchange of petitioner's P stock for the 700 shares of C stock qualifies as a "B" reorganization under section 368(a)(1)(B), and thus petitioner recognizes no gain or loss on this stock-for-stock transaction under section 354. [4] Respondent has not challenged petitioner's treatment of this *770 transaction. There was also a purported installment sale of petitioner's 100 percent interest in L corporation to C corporation for a price of $121,977.11. The issues in this case involve the tax treatment of that sum.
*771 Respondent determined that the purported installment sale of L stock was a distribution in redemption of the stock of C corporation through the use of a related corporation under section 304(a)(1) and was taxable to petitioner as a dividend under sections 301, 302, and 316. Petitioner seeks to combine the "B" reorganization involving his P stock and the installment sale involving his L stock. He wishes to treat them as a single transaction whereby he exchanged his L and P stock for 700 shares of C stock, plus "other property or money" of $121,977.11, which transaction he says is governed by section 351 and hence entitled to capital gains treatment. Petitioner seems to concede that the transaction falls within section 304(a)(1), but to argue that both section 304(a)(1) and section 351 apply here but that section 351 must take precedence, Commissioner v. Stickney,399 F. 2d 828 (6th Cir. 1968), affg. Haserot v. Commissioner,46 T.C. 864 (1966). In any event, our review of the facts and the pertinent Code provisions, detailed below, satisfies us that the transaction comes within section 304(a)(1). Moreover, regardless of whether or not section 351 *772 overrides section 304, we conclude that section 351 simply does not apply to this case, because petitioner does not satisfy the 80 percent control requirement inasmuch as the attribution rules of section 318(a) do not apply to section 351. Respondent's determination that petitioner's purported installment sale of his L corporation stock to C corporation is includable in petitioner's gross income as a dividend is based on the combined operation of several sections of the Code. Under certain circumstances, section 304 provides that the purported sale of a taxpayer's stock to a corporation he controls is to be treated as a distribution in redemption of the acquiring corporation's stock. [5] For section 304 to treat petitioner's purported sale of L stock as a distribution in redemption of C stock, two conditions must be present. The first condition is that petitioner must have been in "control" of each of the two corporations. Sec. 304(a)(1)(A). The second condition is that in exchange for property, one of the corporations must have acquired stock in the other corporation from the person so in control. Sec. 304(a)(1)(B).
*773 For these purposes "control" is defined in section 304(c)(1) as the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock. Section 304(c)(3) expressly provides that the attribution rules relating to the constructive ownership of stock provided in section 318(a) [6] are applicable in determining whether control is present. *774 With respect to L corporation, petitioner satisfied the control requirement since he owned 100 percent of the L stock outright. Petitioner also had the required control of C corporation. He owned 31.6 percent outright (30 of 95 outstanding shares). Petitioner is also considered to own by attribution the stock owned directly or indirectly by his two sons, John B. Brams and James O. Brams. Sec. 318(a)(1)(A)(ii).They collectively owned 52.6 percent of C corporation stock outright (50 of 95 shares). Since the sons were the income beneficiaries of the Stanley H. Brams Trust, they are considered to own by attribution the stock which the trust owned in proportion to their actuarial interest in the trust. Sec. 318(a)(2)(B)(i). [7] The trust owned 14.7 percent (14 of 95 shares) of C stock, a portion of which is attributed to petitioner's sons according to their actuarial interest in the trust and then reattributed to petitioner. Sec. 318(a)(1)(A)(ii). Petitioner thus owned, or is considered to own, more than 84.2 percent of the stock of C (31.6 percent he owned outright, plus 52.6 percent which his sons owned outright, plus some portion of the 14.7 percent which the Stanley H. Brams *775 Trust owned). Sec. 318(a)(5)(A). Thus the first condition as specified in section 304(a)(1)(A) has been satisfied. Petitioner had control of both C corporation and L corporation. The condition provided by section 304(a)(1)(B) requires that, in exchange for property, one of the corporations acquire stock in the other corporation from the person so in control. In the purported sale of L stock, C corporation exchanged property worth $121,977.11 in cash, marketable securities, and a promissory note to acquire the stock of L corporation from petitioner, the person in control of both corporations. The two preliminary conditions of section 304(a)(1) having been satisfied, section 304(a)(1) thus requires that the property (the $121,977.11) be treated as a distribution in redemption of C corporation stock. [8] This redemption in turn is *776 governed by section 302 [9] and depending on the facts is to be treated either as an exchange or as a distribution to which section 301 applies. Section 302(a) provides that if a redemption of stock meets any of the tests provided by section 302(b), the redemption shall be treated as a distribution in exchange for stock. Section 304(b)(1) provides that in making the determination under section 302(b) reference is made to the stock of the issuing corporation, in this case L corporation. The redemption of stock in this case does not come within any of the provisions in section 302(b) that would permit it to be treated as an exchange. See Sec. 302(b)(1), (b)(2), (b)(3), and Sec. 304(b)(1). *777 None of the tests of section 302(b) having been satisfied, section 302(d) applies to treat the redemption as a distribution of property to which section 301 applies. Section 301(c)(1) provides: "That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income." Section 316 in turn defines a dividend as any distribution of property made by a corporation to its shareholders from current or accumulated earnings and profits. [10] Section 304(b)(2)(A) provides that the determination of the amount which is a dividend is made by reference to the earnings and profits of the acquiring corporation, which in this case is C corporation. The parties have stipulated that at the time of the transaction the earnings and profits of C corporation were in excess of $121,977.11, the total purchase price of the stock, and that in each of the years 1973 through 1976 C corporation had earnings and profits in excess of the amount of each installment. Thus, the combined operation of sections 301, 302, 304, 316, and 318 calls for dividend treatment for the $121,977.11. *778 Petitioner does not appear to dispute that the transaction satisfies the requirements of section 304. He argues instead that while the transaction comes within both section 304 and 351, it should be governed by section 351. Section 351 provides in pertinent part: SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR. (a) General Rule.--No gain or loss shall be recognized if property is transferred to a corporation (including, in the case of transfers made on or before June 30, 1967, an investment company) by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property. (b) Receipt of Property.--If subsection (a) would apply to an exchange but for the fact that there is received, in addition to the stock or securities permitted to be received under subsection (a), other property or money, then-- (1) gain (if any) to such recipient shall be recognized, but not in excess of-- (A) the amount *779 of money received, plus (B) the fair market value of such other property received; and (2) no loss to such recipient shall be recognized. To satisfy the requirement of section 351(a) that he receive stock in the transferee (C) corporation, petitioner has argued that the two transactions involving his P stock and L stock be combined as one. [11] Petitioner points to his business purpose for combining the corporations and the fact that the transfers were all done simultaneously as support for his argument that the transfers be combined. Under his view of the transaction, petitioner transferred his stock in L corporation and P corporation to C corporation in exchange for stock in C corporation plus "other property or money" within the meaning of section 351(b) in the form of publicly traded stock and a promissory note. Petitioner also maintains that immediately after the exchange he "owned or controlled" C corporation. He argues that under section 351(b) he thus recognizes long-term capital gain. *780 Petitioner bases his argument on Commissioner v. Stickney,supra, which holds that when both section 304 and section 351 apply to a transaction, section 351 controls. [12] Any appeal in this case would lie to the Sixth Circuit. Petitioner argues that he planned his transaction to conform to that of Haserot, the taxpayer in Commissioner v. Stickney,supra, and that we must uphold him. [13] Unfortunately for petitioner, he did not accomplish his objective. Regardless of any conflict between sections 304 and 351 in other cases, [14] the transaction here simply does not come within section 351. *781 The crucial difference between this case and the Stickney case is made apparent by comparing the percentage of H corporation stock owned by Haserot immediately after those transfers with the percentage of C corporation stock owned by petitioner immediately after the transfers in this case. Haserot owned 82.3 percent of H corporation outright. Petitioner owned only 34 percent of C corporation outright (6,730 shares of 19,795 shares outstanding.) For purposes of section 351, Haserot was in control of H corporation immediately after the exchange. Petitioner on the other hand did not satisfy the 80 percent control requirement of section 351. Section 351(a) refers to section 368(c) for its definition of control. Section 368(c) [15] defines control as the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of voting stock and at least 80 percent of the total number of shares of all other classes of stock of the corporation. Petitioner argues that he satisfied the control test of section 368(c) because he "owned or controlled" 98.8 percent of C corporation. Petitioner has apparently considered and applied the attribution rules of *782 section 318 for purposes of determining whether the 80 percent control test of section 368(c) (and therefore section 351) is satisfied. Petitioner is incorrect in his interpretation of section 368(c). The attribution rules of section 318 do not apply to section 351 or section 368(c). Section 318(a) applies only to "those provisions of this subchapter to which the rules contained in this section are expressly made applicable--." (Emphasis added.) Neither section 351 nor section 368(c) expressly makes applicable the attribution rules of section 318. In Berghash v. Commissioner,43 T.C. 743 (1965), affd. 361 F. 2d 257 (2d Cir. 1966), we stated the rule as follows (43 T.C. at 757): [S]ection 318(a) expressly provides *783 that that section shall apply only "For purposes of those provisions of this subchapter to which the rules contained in this section are expressly made applicable--." Section 318 is not expressly made applicable to part III of subchapter C which includes section 368 containing the provisions dealing with corporate reorganizations. Consequently, the stock attribution rule of section 318(a)(3) relating to the ownership of stock subject to an option is not applicable to the stock ownership requirement regarding corporate control as defined by section 368(c). See also Kern's Bakery of Va. v. Commissioner,68 T.C. 517, 527 (1977). Petitioner therefore may not use the section 318 attribution rules to meet the 80 percent control test of section 368(c), and thus does not satisfy the control requirements of section 351. We must conclude that the purported sale of petitioner's L stock to C corporation is a redemption of C corporation stock under section 304, which is treated as a dividend distribution under section 301(c)(1) and thus ordinary income to petitioner. Respondent initially determined that petitioner received dividend income as each installment was received *784 in each of the years in issue. After this case was submitted we had occasion to consider whether installment treatment under section 453 was permissible where section 304 applied so as to treat the purported sale as a distribution to which section 301 applied. Cox v. Commissioner,78 T.C. 1021 (1982). [16] We held that there was no "casual sale or other casual disposition of personal property," as required by section 453(b)(1)(B). Accordingly, we hold that installment reporting is unavailable to petitioner who, because of the application of section 304, is deemed to have received a dividend distribution in 1973. *785 To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years involved, unless otherwise indicated.↩
2. According to the minutes of the meeting, in order to establish a value for L corporation, the business had been actively offered for sale at $150,000. Counteroffers had been received in amounts ranging from $105,000 to $110,000. The value of $115,000 plus receivables and accounts was agreed to be an accurate estimate of an open market sale price.↩
3. We note that the parties stipulated that a payment of $24,396.32 was made in 1973, and that is the figure reported on petitioner's tax return for that year.↩
4. SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS. (a) Reorganization.-- (1) In General.--For purposes of parts I and II and this part, the term "reorganization" means-- (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporation (whether or not such acquiring corporation had control immediately before the acquisition); Section 354 provides in pertinent part: SEC. 354. EXCHANGES OF STOCK AND SECURITIES IN CERTAIN REORGANIZATIONS. (a) General Rule.-- (1) In General.↩--No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.
5. Section 304 provides in pertinent part: SEC. 304.REDEMPTION THROUGH USE OF RELATED CORPORATIONS. (a) Treatment of Certain Stock Purchases.-- (1) Acquisition By Related Corporation (Other Than Subsidiary).--For purposes of section 302 and 303, if-- (A) one or more persons are in control of each of two corporations, and (B) in return for property, one of the corporations acquires stock in the other corporation from the person (or persons) so in control, then (unless paragraph (2) applies) such property shall be treated as a distribution in redemption of the stock of the corporation acquiring such stock. In any such case, the stock so acquired shall be treated as having been transferred by the person from whom acquired, and as having been received by the corporation acquiring it, as a contribution to the capital of such corporation. (b) Special Rules For Application of Subsection (a).-- (1) Rule For Determinations Under Section 302(b).--In the case of any acquisition of stock to which subsection (a) of this section applies, determinations as to whether the acquisition is, by reason of section 302 (b), to be treated as a distribution in part or full payment in exchange for the stock shall be made by reference to the stock of the issuing corporation. In applying section 318(a) (relating to constructive ownership of stock) with respect to section 302(b) for purposes of this paragraph, sections 318(a)(2)(C) and 318(a)(3)(C) shall be applied without regard to the 50 percent limitation contained therein. (2) Amount Constituting Dividend.-- (A) Where Subsection (a)(1) Applies.--In the case of any acquisition of stock to which paragraph (1) (and not paragraph (2)) of subsection (a) of this section applies, the determination of the amount which is a dividend shall be made solely by reference to the earnings and profits of the acquiring corporation.
(c) Control.-- (1) In General.--For purposes of this section, control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote, or at least 50 percent of the total value of shares of all classes of stock. If a person (or persons) is in control (within the meaning of the preceding sentence) of a corporation which in turn owns at least 50 percent of the total combined voting power of all stock entitled to vote of another corporation, or owns at least 50 percent of the total value of the shares of all classes of stock of another corporation, then such person (or persons) shall be treated as in control of such other corporation. (2) Constructive Ownership.↩--Section 318(a) (relating to the constructive ownership of stock) shall apply for purposes of determining control under paragraph (1). For purposes of the preceding sentence, sections 318(a)(2)(C) and 318(a)(3)(C) shall be applied without regard to the 50 percent limitation contained therein.
6. SEC. 318. CONSTRUCTIVE OWNERSHIP OF STOCK. (a) General Rule.--For purposes of those provisions of this subchapter to which the rules contained in this section are expressly made applicable-- (1) Members of family.-- (A) In general.--An individual shall be considered as owning the stock owned, directly or indirectly, by or for-- (ii) his children, grandchildren, and parents. (2) Attribution from partnerships, estates, trusts, and corporations.-- (B) From trusts.-- (i) Stock owned, directly or indirectly, by or for a trust (other than an employees' trust described in section 401(a) which is exempt from tax under section 501(a) shall be considered as owned by its beneficiaries in proportion to the actuarial interest of such beneficiaries in such trust. (ii) Stock owned, directly or indirectly, by or for any portion of a trust of which a person is considered the owner under subpart E of part I of subchapter J (relating to grantors and others treated as substantial owners) shall be considered as owned by such person. (C) From corporations.↩--If 50 percent or more in value of the stock in a corporation is owned, directly or indirectly, by or for any person, such person shall be considered as owning the stock owned, directly or indirectly, by or for such corporation, in that proportion which the value of the stock which such person so owns bears to the value of all the stock in such corporation.
7. Section 1.318-3(b), Income Tax Regs., and section 20.2031-7↩, Estate Tax Regs., provide the rules for determining the beneficiaries' actuarial interest in a trust.No information has been provided which would allow us to determine their actuarial interest in the trust, but such a determination is not necessary for the resolution of this case.
8. Pursuant to section 304(a)(1), the L stock acquired by C corporation is treated as a contribution by petitioner to the capital of C corporation. Section 1.304-2(a), Income Tax Regs.↩, provides that petitioner's basis in his C corporation stock is then increased by his basis in the L corporation stock. 9. SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK. (a) General Rule.--If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock. (b) Redemptions Treated as Exchanges.-- (1) Redemptions not equivalent to dividends.--Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend. (2) Substantially disproportionate redemption of stock.-- (A) In general.--Subsection (a) shall apply if the distribution is substantially disproportionate with respect to the shareholder. (3) Termination of shareholder's interest.--Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder. (c) Constructive Ownership of Stock.-- (1) In general.--Except as provided in paragraph (2) of this subsection, section 318(a) shall apply in determining the ownership of stock for purposes of this section. (d) Redemptions Treated as Distributions of Property.↩--Except as otherwise provided in this subchapter, if a corporation redeems its stock (within the meaning of section 317(b)), and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies.
10. Section 316(a) provides: (a) General Rule.--For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders-- (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection.↩
11. In Rose Ann Coates Trust v. Commissioner,55 T.C. 501 (1970), affd. 480 F. 2d 468 (9th Cir. 1973), cert. denied 414 U.S. 1045↩ (1973), we held that section 351 was inapplicable to a transaction that was otherwise governed by section 304 because the taxpayer-transferors did not receive stock or securities in exchange for property, as required by section 351(a).
12. The litigation in Haserot v. Commissioner,46 T.C. 864 (1966), originated at 41 T.C. 562 (1964). We recognized that the transaction involved fell within the literal language of both section 351 and section 304. We held that section 351 controlled. On appeal the Sixth Circuit remanded for a determination under section 302 as to whether the transaction was essentially equivalent to a dividend. 355 F. 2d 200, 201 (6th Cir. 1966). On remand, we held that the distribution was essentially equivalent to a dividend, but we did not reconsider our prior decision as to the applicability of section 304. 46 T.C. 864, 872 (1966). See, however, the separate views of Judge Tannenwald. 46 T.C. at 872-878. The Sixth Circuit affirmed, holding that section 351 governed. 399 F. 2d 828↩ (6th Cir. 1968). 13. Under the rule of Golsen v. Commissioner,54 T.C. 742, 756-758 (1970), affd. 445 F. 2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971), we would be constrained to follow the decision in Commissioner v. Stickney,399 F. 2d 828 (6th Cir. 1968), affg. Haserot v. Commissioner,46 T.C. 864↩ (1966), and hold that section 351 governed, if both section 304 and section 351 applied to this case. 14. While the Sixth Circuit has decided that section 351 governs when both section 304 and section 351 apply, the Ninth Circuit has said that section 304 would override section 351. Rose Ann Coates Trust v. Commissioner,480 F. 2d 468, 472 (9th Cir. 1973), affg. 55 T.C. 501 (1970), cert. denied 414 U.S. 1045 (1973). The conflict between sections 304 and 351 has apparently been resolved by section 226(a)(1) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248. This legislation provides for a coordination of section 304 and section 351. Generally, section 304 will govern a transaction even if section 351 would otherwise be applicable. Section 351 would apply only to the extent the transaction consisted of an exchange of stock for stock in the acquiring corporation. H. Rept. No. 97-760 (Conf.) 541-542 (1982), 1982-39 I.R.B. 37↩. The new legislation is effective for transfers occurring after August 31, 1982, in taxable years ending after that date.
15. SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS. (c) Control.↩--For purposes of part I (other than section 304), part II, and this part, the term "control" means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation.
16. We invited the parties to submit supplemental briefs limited solely to the question of whether installment sale treatment as provided by section 453 is applicable to this case. We also granted respondent's motion to amend his answer pursuant to Rule 41(a), Tax Court Rules of Practice and Procedure↩, to allege an increased deficiency for 1973 resulting from the disallowance of installment sale treatment to the transaction in this case. See section 6214(a). In addition, the adjustments to the remaining years in issue will be reduced by eliminating the capital gain on each installment as reported by petitioner.